# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| Plaintiff, | ) No. CR 09-00905-TUC-DCB (JM) |
| vs. | ) |
| David Alejo-Martinez, et al, | ) **REPORT AND RECOMMENDATION** |
| Defendants. | ) |

Pursuant to District Judge Bury's Minute Order dated May 5, 2009, the Defendants' motions came on for hearing before Magistrate Judge Marshall on April 1, 2010. Defendants were present and assisted by counsel. The motions under consideration are: Motion to Sever Counts and Defendants [Doc. No. 83] filed by Defendant Ernest Sanchez; Motion to Dismiss Count II [Doc. No. 84] filed by Defendant Sanchez; and Motion to Dismiss Count I [Doc. No. 92] filed by Defendant Bermudez-Chavez, in which co-defendants Alejo-Martinez, Sanchez, and Grajeda-Encinas have joined.[1] No testimony was presented and the motions were submitted based on the briefs and argument of counsel. Having fully considered the matter, the Court issues its Report and Recommendation.

**I.  Background**

   **A.  The Superseding Indictment**

As is relevant to the motions under consideration, the Superseding Indictment, filed on August 12, 2009, alleges two counts. Count I alleges that Defendants Jose Jesus Morales,

---

[1] This case was originally charged against six defendants. Defendants Suarez and Solorio-Ontiveros have alreadypled guilty and were sentenced on charges of Misprison of Felony. Four Defendants remain and are scheduled for trial on May 11, 2010.

Jr., Victor Manuel Bermudez-Chavez, Ernest Sanchez, and Abelardo Grajeda-Encinas conspired, from about February 2009 until April 21, 2009, to possess with the intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II).

Count II alleges that, on or about March 26, 2009, Defendants possessed cocaine with the intent to distribute and did aid and abet each other and others to possess with intent to deliver 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II).

## B.     Relevant Facts

As the Government's allegations are summarized by Defendant Sanchez, this case began when a confidential informant ("CI") introduced Special Agent Ronald Morinelli ("SA Morinelli") to Jose Morales and Manuel Bermudez-Chavez in late February 2009. At a meeting on February 24, 2009, which allegedly took place in the CI's vehicle, SA Morinelli, posing as a buyer, told Morales and Bermudez that he was looking for a steady source of cocaine in Arizona. Morales indicated that his family could supply the cocaine and that he was going to Mexico and would check on a price.

On March 24, 2009, an alleged meeting took place between the CI, SA Morinelli, Morales and Bermudez. At that meeting, the parties attempted to negotiate the price for a kilogram of cocaine. Bermudez and Morales offered the cocaine at $23,000 per kilogram. Sanchez was not present at the meeting.

On March 26, 2009, a meeting occurred between Morales, Bermudez, the CI, and SA Morinelli at which SA Morinelli allegedly purchased one sample kilogram of cocaine from Bermudez and Morales. SA Morinelli arrived at the meeting, which was in the parking lot of a grocery store, after the CI had verified the presence of the cocaine in the possession of Bermudez and Morales. Bermudez and Morales had previously arrived at the meeting location together, with at third person, Abelardo Grajeda-Encinas. At the meeting,

Bermudez allegedly claimed that he had brought an additional 19 kilograms of cocaine, which he offered to show SA Morinelli. SA Morinelli declined and Bermudez and Grajeda left the scene with the money for the one kilogram of cocaine. Morales remained behind and he and SA Morinelli allegedly negotiated more on the issue of price, during which Morales claimed to have access to cocaine in Houston, Texas and Florida. SA Morinelli told Morales that he needed a better price for the cocaine. Morales allegedly said he would look into getting a better price. Morales allegedly said that he was ready to do the 100 kilogram transaction. The two further discussed where the transaction could take place. Then Morales was picked up by Bermudez and Grajeda. Sanchez was not present at this meeting.

On April 1, 2009, an alleged meeting took place at the Tucson International Airport on board an undercover DEA aircraft, portrayed as belonging to SA Morinelli. DEA Agents Pritchard, Hooks, and Hauser were present, along with SA Morinelli, and the CI. Morales arrived with Grajeda and allegedly said that he had 77 kilograms available at that moment. SA Morinelli said the he would wait for the 100 kilograms so that they could conduct one transaction. Additional negotiations ensued in the aircraft regarding the price per kilogram of cocaine. Morales agreed to drop the price per kilogram by $100. SA Morinelli said that he wanted to conduct the transaction in public. SA Morinelli then directed Grajeda to open a duffle bag inside the aircraft, revealing $1.5 million in $10,000 increments. Further discussion ensued regarding logistics and then the meeting ended. Later that day, SA Morinelli received a call from the CI saying that Morales was pleased and convinced that SA Morinelli and the others were not DEA agents. Morales assured the CI that he was ready to conduct the transaction. Sanchez was not present at the April 1, 2009, meeting on the aircraft.

On the morning of April 17, 2009, another meeting allegedly occurred between Morales, Bermudez, the CI and SA Morinelli at a Lowe's parking lot. Morales and Bermudez arrived in a Jeep Cherokee. A third unidentified person, sitting in the back seat,

never left the vehicle. At that meeting, Bermudez and Morales allegedly told the SA that they had 123 kilograms of cocaine, but wanted to sell 10 kilograms before anything else occurred. SA Morinelli said he wanted to do the whole transaction at one time. Bermudez and Morales responded that they would see if their source was willing to do two transactions for 50 kilograms. Bermudez and Morales later contacted the CI to say that their source was willing to do this.

A meeting was then set-up at a Safeway parking lot for later that afternoon. However, Morales called the CI and changed the meeting location to a McDonald's nearby. SA Morinelli and the CI arrived in an undercover vehicle, while Bermudez arrived in the passenger seat of a Jeep Cherokee with an unknown Hispanic driver. Morales arrived in a Toyota Corolla. At that meeting, Morales and Bermudez again allegedly offered to do a 10 kilogram transaction. SA Morinelli said that he was not interested in the 10 kilograms, but Morales and Bermudez said that he needed to purchase the 10 kilograms as an act of good faith. SA Morinelli said that he would purchase the 10 kilograms only if Morales and Bermudez could prove that they were capable of providing more than 10 kilograms. SA Morinelli did not see the alleged kilograms of cocaine that Bermudez claimed to have brought to the scene and shortly thereafter he departed. Afterward, the CI received a call from Morales explaining his position that SA Morinelli needed to purchase 10 kilograms before an additional transaction could take place. Sanchez was not present at either meeting.

Two days later, the CI was contacted by Bermudez about a new source of supply for 48 kilograms. Bermudez told the CI that he was willing to show SA Morinelli the 48 kilograms, but that he still wanted SA Morinelli to purchase 10 kilograms first. SA Morinelli instructed the CI to set-up one more meeting to attempt to negotiate a deal.

On April 21, 2009, a meeting between Bermudez, Morales, SA Morinelli and SA Tracy Mendez (posing as Morinelli's wife) took place at La Parilla Suiza restaurant on Oracle Road in Tucson. The CI suggested to Morales and Bermudez that they do a surprise

"flash" of the cocaine to SA Morinelli while at the restaurant. Bermudez allegedly agreed to do this and told the CI that he was going to meet with Morales and bring the cocaine to the restaurant.

DEA surveillance witnessed Bermudez parked at the restaurant, leaving shortly before SA Morinelli, SA Mendez and the CI arrived at La Parilla Suiza. Bermudez then left and returned with Morales to the restaurant a short time later. During the meeting, Bermudez explained to the SA that the had two separate sources, one with 48 kilograms of cocaine and the other with 50 kilograms. Morales then allegedly said that he still wanted to do a 10 kilogram deal first. Morales offered to show SA Morinelli the cocaine. SA Morinelli agreed to do the 10 kilograms first but wanted to see proof that Morales and Bermudez could supply more. Bermudez and Morales allegedly boasted about their drug connections and previous transactions. Morales then made a phone call.

SA Morinelli, Morales and the CI walked outside the restaurant and into the parking lot. Juan Carlos Suarez, a co-defendant, arrived in a Toyota Tundra. Morales then opened the rear passenger door and grabbed a small black bag. He subsequently removed a brick-shaped package and cut into it, revealing a substance consistent with the appearance of cocaine, and which ultimately tested and was found to be cocaine. He motioned to beer boxes in the truck which contained packages which Morales said contained approximately 46 kilograms of cocaine. According to reports, Morales was very nervous at this point. Morales then placed the kilogram of cocaine into the beer box with the other packages and shut the truck door. Suarez then drove away.

SA Morinelli, Morales and the CI then went back inside the restaurant. SA Morinelli then asked Morales if he wanted him to bring the money for the 10 kilograms or for the entire amount. Morales said he wanted to start with the 10 kilograms. SA Morinelli told SA Mendez to make a telephone call to have the money prepared and to wait at the vehicle for them. SA Morinelli, Bermudez and Morales allegedly agreed to conduct the 10 kilogram

5

1 transaction one hour later at a grocery store parking lot. After the meeting, the defendants were taken into custody.

Prior to departing the restaurant parking lot, SA Morinelli and SA Mendez observed a subject, later identified as Sanchez, seated in a dark blue Jeep Cherokee allegedly watching SA Morinelli and SA Mendez. An additional surveillance report indicated that Sanchez had arrived at the restaurant parking lot at 1:30 p.m., presumably on foot, and entered the back seat of the Cherokee, in which Bermudez and Morales had earlier arrived. A few minutes later, he got out of the back seat and got into the front passenger seat, where he stayed throughout the meeting. At the end of the meeting, when the arrest order was issued, Sanchez attempted to flee, but was subsequently detained.

A search of the Tundra, driven by Suarez, revealed that the packages in the back of the vehicle contained fake cocaine. An analysis of the packaging of the fake cocaine revealed latent prints from Sanchez and a man named Gilberto Ramirez.

**II.    Motion to Dismiss Count II [Doc. No. 84] filed by Defendant Sanchez**

Sanchez argues that Count II should be dismissed as to him. In response, the Government, while not agreeing with the basis of Sanchez's argument, moves that Count II be dismissed as to Sanchez. The Government, relying on *Levine v. United States*, 383 U.S. 265 (1966), and *United States v. Lothian*, 976 F.2d 1257 (9th Cir. 1992), states that conspirator liability under *Pinkerton v. Untied States*, 328 U.S. 640 (1946), does not extend to defendants who were not members of the conspiracy when the substantive crime was committed. As the Government is without evidence that Sanchez was a member of the conspiracy on March 26, 2009, the date of the event forming the basis of the allegations in Count II, the count is properly dismissed as to Sanchez and the Government so moves. As such, the Court recommends the dismissal of Count II as to Defendant Sanchez.

/ / /

/ / /

**III. Motion to Sever Counts and Defendants [Doc. No. 83] filed by Defendant Ernest Sanchez**

**A. Counts**

Having recommended the dismissal of Count II as to Sanchez, the Court recommends that Sanchez's motion to sever counts be denied as moot.

**B. Defendants**

Sanchez also moves for the Court to sever his trial on the remaining count from those of his co-defendants. Rule 8(b) of the Federal Rules of Criminal Procedure states that two or more defendants may be charged in the same indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." However, Rule 14(a), Fed.R.Crim.P., provides:

> If the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government, the court may order separate trial of counts, sever the defendants' trials, or provide other relief that justice requires.

The level of prejudice required to support severance is significant. The joinder of defendants must be "so manifestly prejudicial that it outweighs the dominant concern with judicial economy . . . ." *United States v. Doe*, 655 F.2d 920, 926 (9th Cir. 1980) (citations omitted).

Here, Sanchez submits that manifest prejudice will result without severance because the evidence against his co-defendants, particularly Bermudez and Morales, is strong and consists of statements recorded by law enforcement. He is also concerned that the jury may convict him based on "spillover" of evidence that Bermudez and Morales boasted of having taken part in previous drug transactions and drug-related killings. Sanchez contends that the evidence against him, which only consists of his fingerprints on packaging and his presence at La Parilla Suiza on April 21, 2009, is "very discrete and limited," and being tried with his co-defendants "will essentially push the jurors to convict [him] on the basis of his association with the other defendant and his presence in the courtroom with them at trial."

While a disparity in evidence may support severance, in this case a jury could easily compartmentalize the evidence as it relates to Sanchez. *United States v. Cruz*, 127 F.3d 791, 799 (9th Cir. 1997). Just as he has done in the motion, at trial Sanchez can readily explain that the evidence against him is "very discrete and limited" and thereby avoid any potential prejudice that potentially could result from being tried with his co-defendants. Additionally, he may request a cautionary instruction limiting the evidence that the jury can properly consider in his case. *See United States v. Nelson*, 137 F.3d 1094, 1108 (9th Cir.) (limiting instructions cured any prejudice to defendant arising from evidence of other crimes by co-defendants), *cert. denied*, 525 U.S. 901 (1998); *United States v. Castro*, 887 F.2d 988, 998 (9th Cir. 1989) (cautionary instruction used to avoid prejudice from inflammatory evidence admitted against co-defendant).

The Ninth Circuit has determined that it is in the public interest to jointly try defendants who are indicted together. *United States v. Camacho*, 528 F.2d 464, 470 (9th Cir.), *cert. denied sub nom. Raygoza v. United States*, 425 U.S. 995 (1976). Judicial economy is also a consideration in evaluating a motion to sever. *United States v. Taren-Palma*, 997 F.2d 525, 533 (9th Cir. 1993). *See also Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (separate trials not warranted where presentation of same evidence to separate juries required). Given these considerations, Sanchez has not presented the manifest prejudice required to support severance.

**IV.   Motion to Dismiss Count I [Doc. No. 92]**

Defendants contend that Count I of the Superseding Indictment must be dismissed because much of the cocaine at the April 21, 2009 meeting was fake. Defendants cite *United States v. Sampson*, 140 F.3d 585 (4th Cir. 1998), *and United States v. Clifford,* 197 F.Supp.2d 516 (E.D. Va. 2002), to support their argument. In these two cases, the defendants asserted, and the court agreed, that they could not be prosecuted for the sale of counterfeit drugs, fake cocaine in *Sampson* and fake

8

MDMA (ecstacy) in *Clifford*. Addressing the sale of fake cocaine (known as "flex"), the court in *Sampson* found it was not a "counterfeit substance" as defined in 21 U.S.C. § 802(7):

> Selling flex does not constitute a crime punishable by any known federal law. Simply because a substance looks like cocaine, and the defendant misrepresents to his unsuspecting purchaser that the substance is cocaine, does not make the mere distribution of that substance a violation of the federal narcotic laws.

104 F.3d at 589.

In *Clifford*, the court addressed whether the defendants could be charged under federal narcotics laws for the sale of artificial MDMA. Relying in part on *Sampson*, the *Clifford* court determined that they could not. 197 F.Supp2d at 522. In the most superficial way, the reasoning in *Sampson* and *Clifford* appears to help Defendants, as fake drugs, as they were in those cases, are involved in this case. However, closer inspection reveals that those decisions are unhelpful to Defendants.

Immediately after finding that the distribution of flex did not constitute a violation of federal law, the *Sampson* court proceeded to explain that the defendants "could not be, and were not, convicted of a crime based on selling flex." *Id*. What the government had done was "introduce evidence of flex sales, but merely as one of many 'overt acts' undertaken by the co-conspirators that demonstrated the existence of the conspiracy." This being the case, the *Sampson* court evaluated the relevancy of this evidence to the charge of unlawfully conspiring to distribute illegal narcotics, and determined that:

> the government can introduce a wide variety of lawful conduct to demonstrate that conspirators maintained the trust and comfort necessary to conspire to commit unlawful acts. Here, two witnesses . . . testified to first-hand knowledge that [the defendants] agreed to sell flex in lieu of cocaine to turn a quick profit so that they could purchase more illegal narcotics in the furtherance of their drug operation. Thus, evidence of these flex sales, which was not itself criminal conduct, proves highly relevant to demonstrating that [the defendants] worked in concert to violate federal narcotics laws.

9

*Id.* at 589-90. Similarly, in *Clifford*, the court noted that "while defendants may not have violated federal drug enforcement laws by selling ginseng and vitamin B as MDMA," their conduct may have nevertheless violated conspiracy laws. 197 F.Supp.2d at 522 n. 17.

In the instant case, the fake cocaine is being used by the government much like it was used in *Sampson*. As the government explains, the fake cocaine's only evidentiary value "is the presence of fingerprints of the co-conspirators on the wrapping." *Response*, p. 2. This use is precisely what the *Sampson* court approved. The government did not use the fake cocaine to support charging the Defendants with a violation of the law and intends only to use it as evidence of the conspiracy. A conspiracy requires "'an agreement to accomplish an illegal objective coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit that underlying, substantive offense.'" *U.S. v. Schmidt,* 947 F.2d 362, 367 (9th Cir.1991) (quoting *United States v. Melchor-Lopez,* 627 F.2d 886, 890 (9th Cir.1980)). "The agreement need not be explicit, but may be inferred from circumstantial evidence . . . ." *Melchor-Lopez,* 627 F.2d at 891. The fake cocaine here serves to support the government's assertion that the Defendants' intended to convince the agents that they would be able to complete a large sale. As the government points out, "[w]hat matters in a conspiracy is whether the defendants agreed to commit the underlying offense, not whether their conduct would actually have constituted that offense." *Response,* p. 3 (citing *United States v. Rosa*, 17 F.3d 1531, 1543 (2nd Cir. 1994). The fake cocaine may be relevant to prove the agreement and, as because it has not been relied upon to support an alleged violation of the law, there is no basis for dismissing Count I.

**V.  Recommendation for Disposition by the District Court Judge**

For all of the above reasons, **THE MAGISTRATE JUDGE RECOMMENDS** that the District Court, after its independent review, issue an Order:

1.  **denying** the Motion to Sever Counts and Defendants [Doc. No. 83] filed by Defendant Ernest Sanchez;

10

2. **granting** the Government's Motion to Dismiss Count II as to Defendant Sanchez and **denying as moot** the Motion to Dismiss Count II [Doc. No. 84] filed by Defendant Sanchez;

3. **denying** the Motion to Dismiss Count I [Doc. No. 92].

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.

However, due to the impending trial date, the parties **shall have seven (7) days** from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure. Thereafter, the parties **shall have seven (7) days** within which to file a response to the objections. If any objections are filed, this action should be designated case number: **CR 09-905-TUC-DCB**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to *de novo* consideration of the issues. *See United States v. Reyna-Tapia* 328 F.3d 1114, 1121 (9th Cir. 2003) (*en banc*).

DATED this 5th day of April, 2010.

_Jacqueline Marshall_
Jacqueline Marshall
United States Magistrate Judge

11